SECURITY STATE BANK OF STRASBURG, NORTH DAKOTA, a Corporation, Appellant, v. S. A. FISCHER, Respondent.

(171 N. W. 866.)

**Banks and banking — officers — accounting — estoppel.**

In an action for accounting for certain commissions and profits claimed to have been wrongfully appropriated by the defendant while acting as managing officer of the plaintiff bank, it appeared that during the period when the commissions and profits were earned the defendant was the owner of 60 per cent of the stock of the plaintiff bank and one B. the owner of 40 per cent; that the commissions and profits were earned in transactions not coming within the legitimate scope of the business which the plaintiff corporation was authorized to transact; that there were settlements from time to time between the defendant and the other stockholder; that defendant sold his stock to third parties who purchased it at book value plus an agreed bonus, the book value being arrived at after an inspection of the assets of the bank and upon a statement disclosing its true condition and the claim of the defendant to commission notes held outside the bank, which were also sold as a part of the same transaction, it is *held:*

(1) An officer of a bank who participates in the settlement of business transactions as the personal business of himself and another stockholder, which business is, in fact, *ultra vires* the powers of the bank, is estopped, upon later gaining control of the corporation, to use the corporate name for the purpose of compelling an account.

(2) Stockholders who purchase a controlling interest in a bank at book value plus an agreed bonus, relying upon a true statement of the condition of the bank, and who also purchase the defendant's personal interest in outside securities, a share of which is later claimed in an action for an accounting brought in the name of the bank, are estopped to use the corporate name to gain an interest in past *ultra vires* transactions.

**Banks and banking — bank as loan agent — ultra vires transactions.**

    3. The fact that a bank is designated as the agent for certain companies
for whom loans are made by the officers of the bank, the commissions of which
are either divided between them or retained by the officer negotiating the loans,
does not, in a suit by the bank for accounting, preclude the officer so retain-
ing the commissions from asserting the *ultra vires* character of the trans-
actions, where the corporate name of the bank is being used by persons who
either participated in settling such transactions on a personal basis or who
purchased stock, relying upon a true statement of the assets which excluded
the transactions in question.

Opinion filed March 19, 1919.

Appeal from Emmons County District Court, *Nuessle,* J.
Affirmed.

*Lynn & Lynn,* for appellant.

*Scott Cameron, Charles Coventry,* and *W. S. Lauder,* for respondent.

"A banking corporation as a general rule has no power to act as a
broker for third persons." 3 R. C. L. p. 423, § 51; Grow v. Cockrill,
(Ark.) 36 L.R.A. 89; Bank of United States v. Dunn, 31 U. S. 6;
Western Nat. Bank v. Armstrong, 152 U. S. 346; Weckler v. Bank, 20
Am. Rep. 95; Dresser v. Traders Nat. Bank, 165 Mass. 120; Rouns v.
Third Nat. Bank, 94 Tenn. 57; First Nat. Bank v. Hoch, 89 Pa. 32;
Pepperday v. Citizens Nat. Bank, 183 Pa. 519.

"Equity will not interfere where parties had the same means of
knowledge." 1 Cyc. 464 et seq.

"A purchaser of stock cannot complain of the prior acts and man-
agement of the corporation." 7 R. C. L. p. 489, § 470. See also
Alexander v. Searcy (Ga.) 12 Am. St. Rep. 337; United Electric Se-
curities Co. v. Louisiana Electric Light Co. 68 Fed. 673; Da Ponte v.
Louisiana etc. Lottery Co. Fed. Cas. No. 3,569; Clark v. American
Coal Co. 86 Iowa, 436, 53 N. W. 291; Rankin v. Southwestern Brewing
Co. (N. M.) 73 Pac. 614; Hawes v. Oakland, 104 U. S. 450; Foote v.
Cunard Min. Co. 17 Fed. 46; Dimpfel v. Ohio etc. R. Co. 110 U. S.
209; Taylor v. Homes, 127 U. S. 489; Citizens Savings etc. Co. v.
Illinois C. R. Co. 173 Fed. 556; Price v. Union Land Co. 110 C. C. A.
20, 187 Fed. 866.

"A party will not be allowed to rescind a contract in part and affirm
it in part, he must rescind entirely or not at all, and must return or
offer to return everything of value which he received from the party

against whom he seeks to rescind." Black, Rescission & Cancellation of Contracts, §§ 583–585; Guild v. More, 32 N. D. 432; Sell v. Mississippi River Logging Co. 88 Wis. 581; Fargo Gas & Coke Co. v. Fargo & Gas & E. Co. 4 N. D. 219; Beare v. Wright, 14 N. D. 31; Gordon-Tiger Min. & Reduction Co. v. Brown, 56 Colo. 301; J. H. Carter & Co. v. Swift Fertilizer Works (Ga.) 71 S. E. 494; Jennings v. Gage, 12 Ill. 610; Baum Iron Co. v. Berg, 47 Neb. 21; Getchell v. Kirkby, 113 Me. 91; Nass v. Chadwick, 70 Tex. 157; Faye v. Oliver, 20 Vt. 118; Grant v. Law, 29 Wis. 99.

BIRDZELL, J. This is an action for an accounting, and the appeal is from a judgment in favor of the defendant. The action is here for trial *de novo*. In the complaint it is alleged that from January 1, 1906, to November 16, 1912, the defendant was president of the plaintiff corporation; that during this period, as president of the bank, he negotiated loans for other persons, receiving promissory notes payable to the bank as compensation or commissions; that he caused the commission notes to be collected, and without the consent or knowledge of the plaintiff corporation he appropriated the proceeds, for which he has since refused to account. Also that, during the same period of time, he caused certain commission notes to be made payable to his own order and to the order of his wife without the knowledge of the plaintiff, though the loans were made through the offices of the plaintiff corporation and the commissions properly inured to its benefit; that the defendant has collected the notes last mentioned and converted the proceeds to his own use.

It is also alleged that the defendant appropriated to his own use the benefit properly accruing to the bank from certain transactions, such as the discounting of a note in which the plaintiff's profit amounted to $380; the sale of a lot for $420; cash commissions of $192 and $160 in real estate loans; and a broker's commission of $100, earned in the sale of a bowling alley; the proceeds of all of which transactions are alleged to have been wrongfully converted by the defendant.

It is further alleged that, after the defendant severed his connection with the bank, on November 16, 1912, certain commission notes were made payable to him and collected by him, which represented commissions on loans in process of negotiation and which properly belonged to plaintiff bank. The concluding paragraphs of the complaint

embrace allegations, upon information and belief, charging the defend-ant with the appropriation of various commissions earned by the plain-tiff in the negotiation of loans and of sales, purchases, and exchanges of real estate. Attached to the complaint are three schedules embracing, in all, thirty-eight notes, the proceeds of which are alleged to have been appropriated by the defendant during the period between March 1, 1910, and December 23, 1912.

The conceded facts are that, in January, 1906, the defendant Fischer, Michael Baumgartner, and M. A. Kline purchased all of the stock of the plaintiff bank, which consisted, at that time, of fifty shares of $100 each. Defendant purchased thirty shares and Baumgartner and Kline ten shares each. Thereafter, and until November 16, 1912, the defendant Fischer was president of the plaintiff bank, always owning 60 per cent of its stock. In 1909, Kline sold his stock to Michael Baumgartner, who thus became the owner of 40 per cent. Ten shares, however, were carried in the name of John Baumgartner, a brother of Michael, for the purpose of complying with the state banking law. During all of the period in question, after Kline disposed of his interest, the ownership of the bank as between Fischer and Baumgartner was in the proportion of 60 to 40. During this period the stock of the bank was doubled. The stockholders, however, contributed no extra capital, the added cap-ital being supplied from the undivided profits. The defendant was also interested in a general store known as the Bazar, in an elevator, and a machinery business. During all of the time that he was president of the bank, however, he was the active managing officer. The other principal stockholder of the bank, Michael Baumgartner, was likewise interested in outside pursuits, such as farming and stock business. In November, 1912, the defendant Fischer sold his sixty shares of stock to Michael Baumgartner or John Baumgartner (to which is immaterial), M. J. Fischer, Lauinger, and Henn, the latter of whom had been assist-ant cashier of the bank for some time. After disposing of his interest in the bank, the defendant moved to St. Paul, where he lived for approx-imately two years. He then returned to Strasburg to re-engage in the banking business, whereupon this suit was instituted.

In addition to the facts above stated, the trial court found that, dur-ing the time the defendant was acting as president and manager of the plaintiff bank, he was also carrying on a real estate and farm loan

business, from which he made a profit aggregating more than $10,000; that this profit never became the property of the plaintiff bank, and that it had no interest therein. The court made no finding as to any agreement between the defendant and Michael Baumgartner with respect to the profits arising from the real estate and farm loan business, for the reason that the action is brought in the name of the bank which purports to be the real party in interest. In these circumstances, the trial court considered that any arrangement which might have existed between the defendant and Baumgartner would be immaterial.

Judgment having been entered in accordance with the findings, the appellant urges that the trial court erred, both in its interpretation of the facts proved upon the trial and in applying the law thereto. The first proposition presented is that the real estate and farm loan business was conducted by the plaintiff bank as a bank, and that the commissions and profits realized therefrom were the property and assets of the bank. The transcript of the evidence covers more than 860 pages and there are numerous exhibits. The testimony and the exhibits relate to so many transactions that it is extremely difficult to analyze the particular transactions and to weigh the evidence with a degree of candor that would insure confidence in any conclusion depending for its correctness upon an isolated transaction. However, we are confident, from our examination of the record, that certain conclusions can be drawn with a fair degree of accuracy relative to the character of the business relations between the plaintiff bank and the defendant as a whole, as well as between the defendant and Michael Baumgartner, who seems to be the party primarily interested in this litigation.

At the outset it appears that the plaintiff bank, under the management of the defendant, has always been successful; that dividends were paid from time to time, and that surplus and undivided profits had accumulated to such an extent that the stock of Kline, who purchased ten shares for $1,200 in 1906, had become worth $2,200 in 1909, when he disposed of it; that later, when the capital stock of the bank was doubled, the accumulated profits only were applied in making the contribution of new capital; and that when the defendant sold his stock in November, 1912, those who were affiliated with Michael Baumgartner in the purchase (though it may be assumed that Michael Baumgartner purchased none for himself) were willing to pay a premium above

the book value of $2,250 upon sixty shares. It appears that, during the earlier period, prior to about 1909, the commissions earned in the negotiation of real estate loans had gone into the bank and had been treated as its property. The defendant testifies, however, that in 1908 there had been some disagreement between him and Kline relative to the payment of a salary claim made by the defendant as managing officer of the bank, and that he had had some further disagreements with Baumgartner arising out of alleged outside transactions of Baumgartner, upon which he claimed that Baumgartner refused to divide the profits; that following these disagreements, he stated that in future he would take the commission from loans negotiated by him. Baumgartner denies that the defendant ever told him in substance that unless he turned into the bank the profits made by him he (Fischer) would take all the commissions on the real estate loans from that time on. But it appears, nevertheless, that the defendant, for a considerable period following these disagreements,—in fact until he sold his interest in the bank,—did take the commissions on real estate loans made by him, and that he shared other commissions with Baumgartner, where Baumgartner appeared to have been instrumental in promoting the loans. The latter disclaims knowledge of the defendant's acts in this respect, but it is beyond dispute that Henn, the assistant cashier, at all times had full knowledge, although he says that he did not communicate the information to Baumgartner until early in 1915. It is difficult, however, to give full credence to the testimony of Henn, the assistant cashier, and of Baumgartner upon this subject, when we take into consideration the methods according to which the loan business was transacted in the bank, including Fischer's apparent openness in having the commission notes credited to his personal account. Fischer had an office in the bank from which most of his business was done, and it seems to have been the custom to keep the commission notes in a separate pouch or pouches. They were not carried upon the books of the bank as assets. Henn testified that the personal account of the defendant would be credited with these items from time to time as the defendant handed them to him with directions to credit his account. The method of handling the commission notes which the defendant claims belonged to him, though in some instances made payable to the bank, does not differ materially from the method of handling paper given in connection with

the other businesses operated by the defendant. For instance, it appears that notes were occasionally given by debtors of the implement company owned by the defendant which were made payable directly to the bank. When these notes were turned into the bank they would be crdited to the account of the implement company, and the same is true of some transactions of the general store in which the defendant was interested.

The appellant, however, argues that the bank is entitled to the commissions because it was in reality the agent of the different loan companies for which the loans were made and in connection with which the commissions were earned; also because in many of the applications the bank was named as the agent of the borrower in obtaining the money. These facts are not controlling in determining the arrangement which existed for the disposition or division of the profits derived from this source. Acting as agent for lenders or borrowers in negotiating real estate loans is not part of the business banks are authorized to transact under the laws of this state. According to subdivision 7 of § 5150, Compiled Laws of 1913, banking corporations may exercise such powers as are incidental to carrying on the business of banking "by discounting and negotiating promissory notes, bills of exchange, drafts and other evidences of debt, by receiving deposits, by buying and selling exchange, coin and bullion, by loaning money upon real or personal security or both." It needs no argument to demonstrate that acting as a loan broker in transactions where the funds of the bank are not loaned is not exercising a power incident to the banking business. In but few, if any, of the transactions in question were any funds of the bank loaned. It may be true, of course, that the defendant would be estopped to assert the *ultra vires* character of transactions purporting to be had by and on behalf the bank in which profits were realized, which, as between him and the other stockholders, should be considered as belonging to the bank. But there is convincing evidence in this record that the defendant openly asserted his claim to the commission notes, and not only openly dealt with them so as to secure credit on his personal account at the bank, but that, from time to time, he settled with the only other interested stockholder; namely, Michael Baumgartner. In these settlements Baumgartner was allowed a *pro rata* share of commissions in transactions in which the defendant considered he was entitled to share,

and there is no evidence that the settlements were unsatisfactory or fraudulent. In these circumstances, there can be no estoppel, operating as against the defendant, to prevent him from asserting the *ultra vires* character of the transactions in so far as the corporation may seek to claim the benefit. Baumgartner, who, as will be seen later, is shown to have received the proceeds of some of the commission notes that are now sought to be recovered by the bank, is rather estopped to use the bank name for the purpose of such recovery. Henn expressly disclaims any interest in this litigation, and, from facts that will appear later, it is perfectly apparent that those who purchased Fischer's stock can have no legitimate interest in it; so it results that Michael Baumgartner is the only one who could, by any possibility, be considered as interested. It is clear, from the record, that Michael Baumgartner is using the corporate name as a vehicle to garner the profits which he claims have been wrongfully retained by Fischer.

For proof that the settlements referred to above were had from time to time between Baumgartner and the defendant, we are not dependent upon the testimony of the defendant alone. There is an exhibit in the case consisting of a small bank book which is labeled on the outside "S.A.F. and M.B.," these being the initials of the defendant and of Michael Baumgartner. This book contains memoranda of sixteen or more transactions had in 1910 in which Baumgartner and the defendant were apparently interested and concerning at least five of which the bank is endeavoring to share in this suit. The items are entered in the handwriting of Henn and he admits having made the memoranda, although both he and Baumgartner exhibit a lack of knowledge as to the settlement for the transactions recorded. Nevertheless, Baumgartner admits that on January 4, 1911, he received a check which represented 40 per cent of the amount shown to be due him on account of the transactions entered in the memorandum book, and which he says might have been given him to pay the balance shown to be due him according to the memoranda. In addition to this testimony, it also appears that, at the time Fischer disposed of his interest in the bank, a statement was drawn up showing the net book value of the stock of the bank, 60 per cent of which was placed at $13,448.42. (One item entering into this aggregate is "commissions," amounting to $2,502.01, which concededly belong to the bank.) To this was added a bonus of

$2,250, which the testimony shows the purchasers of Fischer's interests were paying upon his stock; also $1,563.74, which represented 60 per cent of "commission paper" items aggregating $2,606.24. The statement contained additional items, making a total credit due the defendant upon the sale of his stock and outside interests of $18,457.76. This aggregate credit was reduced by certain debit items, leaving a net amount to be paid to the defendant of $14,520.94. There is abundant testimony in the record to the effect that the purchasers of Fischer's interest in the bank were also buying his share in the commission paper and in the other items embraced in the statement; that the purchasers were present when the statement was prepared and must have known exactly what they were purchasing. It is true that Baumgartner affects ignorance of the items embraced in the statement, at least in so far as the commission paper item is concerned, but, in view of his interest in the sale and of the facilities for information which were at all times open to him, it is difficult to believe that he was not well aware of the fact that Fischer was disposing of his interest in commission paper held outside the bank, aggregating $2,606.24, 40 per cent of the value of which was conceded in the statement to belong to Baumgartner.

It would serve no good purpose to analyze the evidence upon these matters more fully. Suffice it to say that the record contains convincing proof that Fischer at all times during the period in question was asserting his right to retain commissions on deals for which he considered himself personally responsible; that he conceded to Baumgartner the right to share in other deals in which Baumgartner participated to the extent of 40 per cent; that settlements were made between them from time to time on this basis; that the course Fischer pursued was known at all times to Henn, cashier of the bank, and that the purchasers of Fischer's interest in 1912 purchased upon full knowledge as to what they were buying, and that they received fair value for their money. There is no evidence of any concealment or that any profit has been taken by the defendant that he did not at all times assert his right to take as his own individual earnings.

It appearing in this case that the business conducted by the defendant did not compete or come within the scope of business the plaintiff was authorized to conduct, and there being no evidence of an agreement to turn the profits so earned over to the plaintiff, and no basis for an estop-

pel which would operate to preclude the defendant from asserting the *ultra vires* character of the claims of the plaintiff, the findings and judgment of the trial court are manifestly correct and are in all things. affirmed.

GRACE, J. I concur in the result.